**In re Cleveland EVANS, Jr., Debtor.**

**Aletha W. Blackmon, Plaintiff,**

**v.**

**Cleveland Evans, Jr., Defendant.**

**Bankruptcy No. 6:08–bk–03099–KSJ.**
**Adversary No. 6:08–ap–137.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

May 28, 2009.

**318**

---

Julius L. Williams, Winter Park, FL, for Plaintiff.

Andrew C. Baron, Law Office of Andrew Baron, Orlando, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAREN S. JENNEMANN, Bankruptcy Judge.

The plaintiff, Aletha W. Blackmon, undisputedly was a victim of a mortgage fraud scheme orchestrated by the debtor/defendant's employer, Trand Financial Services, Inc. ("Trand"). She now contends that the defendant, Cleveland Evans, Jr., cannot discharge any debt he owes to her in this Chapter 7 bankruptcy case under Section 523(a)(2)(A) of the Bankruptcy Code.[1] The Court agrees the debt is not dischargeable because the defendant was a willing and knowing participant in the fraudulent scheme.

Trand Financial Services, Inc. was a company owned by two men—Mark Bertrand[2] and Lancelot H. Marr. The defendant was the Treasurer for the company from July 2006 through November 29, 2007. (Plaintiff's Exh. No. 19, question number 1). In that role, he had access to the checking and financial records of Trand, although he was not in control of the company's monies. Trand carried out a consistent scheme in defrauding homeowners who were experiencing financial problems and who were facing the potential loss of their home.

In the three known cases involving the defendant, either Marr or Bertrand typically met with the distressed homeowner. They promised the homeowner that, if he or she would convey title to his or her home to a person designated by Trand, the company would obtain a new mortgage and use the equity remaining after payment of Trand's fee to pay the homeowner's bills and then return the balance

---

1. Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

2. Mr. Bertrand is also known as Mark Jerome Bertrand and King Mark Bertrand.

to the homeowner. Trand then promised to "rent" the home back to the homeowner using the monthly rental payments to make the mortgage payments and, after one year of clean credit history, resell the home back to the homeowner for the same price.

The defendant was involved in at least three similar transactions, all following the same general scheme and each orchestrated by Trand. In each case, the defendant completed a false loan application, indicating he earned $15,000 per month. (Trand never paid the defendant a regular salary.) The defendant willingly signed these false loan applications, knowing they were untruthful. The defendant then "purchased" the home from the distressed homeowner, taking title to the property and obtaining a mortgage loan encumbering the property. Trand made no or few payments on the new mortgage and, within a few months, each homeowner lost his or her house through foreclosure. Trand kept the equity monies obtained by the refinancing and never paid the homeowners' outstanding bills.

The first time the defendant participated in this type of fraudulent scheme the property was located at 42 Waterford Circle, Tarpon Springs, Florida. The transfer occurred in June 2006. The defendant received $10,000 for his participation in the scheme.

The second time the defendant participated in Trand's mortgage fraud scheme, he took title to the former home of Yvonne Edwards, located at 7195 S. Carpenter Avenue, Orange City, Florida. The transfer occurred in September 2006. (Plaintiff's Ex. No. 12). Ms. Edwards was a friend of the plaintiff, and, unfortunately, she introduced Mrs. Blackmon to the operators at Trand. Similar to the plaintiff, Ms. Edwards also was facing the loss of her home through foreclosure. Trand followed its typical pattern of promising distressed homeowners financial relief by using the equity in their homes to pay their bills and then allowing them to live in the home until they could repurchase the home a year later.

In Ms. Edwards' case, the defendant signed the Purchase Contract to "buy" her house on August 9, 2006. (Plaintiff's Exh. No. 10). He completed a false loan application, grossly overstating his income, this time reflecting he had liquid assets of $550,000 and had worked at Trand for over 3 years and earned $15,000 per month.[3] (Plaintiff's Exh. No. 13). At the closing on September 18, 2006, the defendant obtained a Warranty Deed and title to Ms. Edwards' home. (Plaintiff's Exh. No. 12). Either the defendant or Trand received $38,549.99 at the closing. (Plaintiff's Exh. Nos. 11 and 14). Trand never paid a single bill owed by Ms. Edwards or paid her any portion of the monies it received at the closing. Trand never made a single mortgage payment, and Ms. Edwards shortly thereafter lost her home in a foreclosure action.

The third known time the defendant participated in this same fraudulent scheme involved the plaintiff's home located at 5119 Timber Ridge Trail, Orlando,

---

**3.** The defendant's actual income, at least what he reports on his federal tax returns, is very low. In 2004, he reported total income of $26,832. In 2005, he reported total income of $10,213. In 2006, he reported total income of $10,216. In 2007, he reported total income of $9,372. In four years, the defendant's total average *annual* income was not even $15,000. He certainly never earned $15,000 in any particular month. (Plaintiff's Exh. Nos. 15, 16, 17, and 18). (The Court also notes that the defendant failed to disclose the acknowledged income of $15,000 he received from his participation in the mortgage fraud scheme on his 2006 federal tax return.)

Florida. The plaintiff received this home as a gift from her father in 1997. (Plaintiff's Exh. No. 1). The plaintiff signed a Warranty Deed conveying title to her home to the defendant on October 27, 2006. (Plaintiff's Exh. No. 2).

The defendant again completed a fraudulent loan application to get a mortgage loan encumbering the plaintiff's home, falsely swearing that he earned $15,000 per month as his base employment income from The Capital Funding Group, LLC. (Plaintiff's Exh. No. 8). The defendant signed all necessary paperwork to get the $218,500 mortgage loan, including an Occupancy Affidavit, in which the defendant swore he intended to live in the plaintiff's home.[4] (Plaintiff's Exh. Nos. 6, 7 and 9). The closing statement reflects that the defendant (or Trand) received $120,714.70 at the closing. (Plaintiff's Exh. No. 3). The defendant never had any intention of living in the plaintiff's home. The defendant received a payment of $5,000 for his participation in this scheme to defraud the plaintiff. (Plaintiff's Exh. No. 19, Question Nos. 4 and 5).

The defendant met with the plaintiff at least twice to further the fraudulent scheme. After the closing, the defendant first met with the plaintiff to obtain a list of the bills she needed Trand to pay from the $120,000 it received at the closing. The plaintiff personally handed the defendant a list of her bills to be paid and then persistently pestered Trand to pay her bills. The company never paid a single bill due to Ms. Blackmon's creditors, although

the plaintiff did receive a single payment of $10,000 from Trand. Trand never paid the plaintiff her remaining equity of $110,714.70 she had in her home. She certainly never agreed to forfeit this equity interest.

On November 8, 2006, the defendant met with the plaintiff for a second time to sign two documents—an Option Agreement to "repurchase" her house in one year (Plaintiff's Exh. No. 4), and a Lease Agreement (Plaintiff's Exh. No. 5). The plaintiff made regular monthly lease payments of $800 per month for several months until, one morning, she was served with a summons informing her that a foreclosure action was filed against the home in the case styled as *Avelo Mortgage, LLC v. Cleveland Evans, Jr., et al.*, Case No. 07–CA–8511, filed in the Circuit Court for the Ninth Judicial Circuit in Orange County, Florida.[5] Only after she was served with the foreclosure papers did the plaintiff stop making regular monthly payments. Trand made few if any mortgage payments to Avelo Mortgage, LLC. The plaintiff later was evicted from her home.

 In this adversary proceeding, the plaintiff asserts that the defendant acted wrongfully and fraudulently in causing her to lose the equity of $110,714.70 she had in her house and that he now cannot discharge the debt pursuant to Section 523(a)(2)(A) of the Bankruptcy Code. The primary purpose of bankruptcy law is to provide an honest debtor with a fresh start by relieving the burden of indebtedness. *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct.

---

**4.** Prior to this bankruptcy, the defendant had lived in the same home since 1999. He had no intention of legitimately purchasing the defendant's home or of re-conveying the home to her at the end of a year, as required by the Option Agreement, discussed later.

**5.** Ms. Blackmon has filed a Crossclaim against the defendant, Bertrand, Marr, the

title company, WTC Title & Escrow Services, LLC, and the closing agent, Frederick Bryant. Mr. Evans failed to answer the Crossclaim. The state court entered a default against Mr. Evans. Prior to entry of judgment, however, Mr. Evans filed this Chapter 7 bankruptcy case on April 21, 2008.

1704, 29 L.Ed.2d 233 (1971); *In re Price,* 48 B.R. 211, 213 (Bankr.S.D.Fla.1985); *Matter of Holwerda,* 29 B.R. 486, 489 (Bankr.M.D.Fla.1983). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Cox,* 150 B.R. 807, 809 (Bankr. N.D.Fla.1992) (*citing In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986); *Kiester v. Handy (In re Handy)* 164 B.R. 355 (Bankr.M.D.Fla.1994)). The party objecting to the debtor's discharge has the burden of establishing that the debtor is not entitled to receive a discharge by the preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (Section 523 action); *In re Chalik,* 748 F.2d 616 (11th Cir.1984) (burden on objecting party); *In re Metz,* 150 B.R. 821 (Bankr.M.D.Fla.1993) (standard of proof is preponderance of the evidence). Accordingly, the plaintiff bears the burden of proving by a preponderance of the evidence that any debt owed to her by the defendant should be excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A).

■ Pursuant to Bankruptcy Code Section 523(a)(2)(A), a debtor cannot discharge a debt to the extent the debt is obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (2008). To establish fraud pursuant to Section 523(a)(2)(A), a plaintiff must prove: (i) the debtor made a false representation to deceive the creditor; (ii) the creditor relied on the misrepresentation; (iii) the reliance was justified; and (iv) the creditor sustained a loss as a result of the misrepresentation. *SEC v. Bilzerian (In re Bilzerian),* 153 F.3d 1278, 1281 (11th Cir.1998).

■ In the instant case, there is no question that Trand's principals made false representations intended to deceive the plaintiff with the assumption that Ms. Blackmon would justifiably rely on their promises. As a result, Ms. Blackmon lost her family home and over $110,000. The plaintiff has established every element needed to make the debt nondischargeable with perhaps one exception—the initial misrepresentations upon which the plaintiff relied were made by Marr or Bertrand, not the defendant. The defendant did not actually meet the plaintiff until after the closing occurred.

■ Courts, however, have held that acts which would merit nondischargeability under Section 523(a) of the Bankruptcy Code can be attributed to a debtor who did not actually perform them, if the debtor was an "active and knowing participant" in a scheme or conspiracy through which a third-party malefactor performed the acts. *In re Markarian,* 228 B.R. 34, 39 (1st Cir. BAP 1998) ("section 523(a)(2)(A) may include debts which arise from the wrongful acts of conspirators and their co-conspirators."); *see also, MacDonald v. Buck (In re Buck),* 75 B.R. 417, 420–21 (Bankr. N.D.Cal.1987) ("a debtor who has made no false representation may nevertheless be bound by the fraud of another if a debtor is a knowing and active participant in the scheme to defraud.") (*citing* 3 COLLIER ON BANKRUPTCY ¶ 523.08[4] at 523–49 (15th ed.1979); *Amen v. Black,* 234 F.2d 12 (10th Cir.1956); *Matter of Newmark,* 20 B.R. 842 (Bankr.E.D.N.Y.1982)).

Prior to the defendant's transaction with the plaintiff, the defendant actively participated in the same fraudulent scheme perpetrated by Trand in earlier transactions with at least two other homeowners. The defendant absolutely knew that the company never made the required mortgage payments, that the company kept prior homeowners' equity, and that the company knew the homes would be lost in

foreclosure actions. Yet, the defendant willingly signed false loan applications to get mortgages encumbering homes in which he never intended to live in, knowing the innocent homeowners would lose the homes in the next year or so.

In this case, the defendant not only furthered Trand's mortgage fraud scheme, he actively deceived Ms. Blackmon after she had transferred title to him to convince her that she would get her bills paid, cash in on the equity in her home, and, in a year, get her home back. Mr. Evans met with the plaintiff to get her to sign an Option Agreement, promising to resell the home to her when he knew he would no longer own it in one year. He also actively kept the plaintiff in the dark as to the nefarious nature of Trand's scheme by retrieving a list of Ms. Blackmon's bills when the defendant knew Trand would not pay a single bill. Lastly, Mr. Evans got the plaintiff to sign a Lease Agreement, again knowing that Trand would not use the rental monies to make the mortgage payments. The Court specifically finds that the defendant acted in concert with Trand, Marr, and Bertrand, in knowingly perpetrating a fraudulent scheme to wrongfully cause damage to the plaintiff. The defendant, an educated man,[6] was an active and knowing participant in the fraudulent scheme. Consequently, any fraudulent acts and representations made by co-conspirators are attributed to the defendant and any debts arising from such acts and representations are excepted from the defendant's discharge pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.

A Final Judgment consistent with these Findings of Fact and Conclusions of Law simultaneously shall be entered in favor of the plaintiff and against the defendant in

---

**6.** The defendant received a bachelor's degree in Electrical Engineering from the University

the amount of $110,714.70, which shall not be dischargeable in this or any later bankruptcy. If the plaintiff has suffered any other additional damages or incurred any additional costs, she shall have 30 days from the entry of this judgment to file an affidavit requesting a supplemental award of damages or costs. The defendant shall have 30 days from the filing of the affidavit to file any objections to the assessment of any requested additional damages or costs. If requested, the Court will set a further hearing on any requested supplemental award.