Jerry A. Funk, United States Bankruptcy Judge
This proceeding is before the Court on Plaintiff FEDERAL TRADE COMMISSION'S (the "Commission's") motion for summary judgment (Doc. 30), Defendant MICHAEL W. LANIER'S ("Debtor's") response in opposition (Doc. 41), the Commission's reply (Doc. 48), as well as Debtor's cross-motion for summary judgment (Docs. 44 & 47), the Commission's response to Debtor's cross-motion (Doc. 49), and Debtor's reply (Doc. 50). For the reasons stated herein, the Court grants the Commission's motion and denies Debtor's cross-motion.
Background
On August 30, 2016 (the "Petition Date"), Debtor filed a Chapter 13 petition. (Doc. 1, in Case No. 3:16-bk-3307). On February 22, 2017, the Chapter 13 case *905 was converted to a Chapter 11 case. (Doc. 99 in 3:16-bk-3307). The Commission filed a proof of claim for almost $13.6 million as to a judgment debt (the "Judgment Debt") resulting from litigation in the United States District Court for the Middle District of Florida (the "District Court"), in case number 3:14-CV-0786 (the "Underlying Action"). (Claim 10-1). The District Court entered an interlocutory order granting summary judgment, on July 7, 2016. (Doc. 1-3). Final summary judgment was rendered on August 12, 2016, eighteen days before the Petition Date. (Doc. 1-2).
The instant Complaint seeks to except the Judgment Debt from discharge, pursuant to 11 U.S.C. § 523(a)(2)(A). (Doc. 1). Count I is the primary count alleging nondischargeability, while Count II includes an argument for issue preclusion based on the Underlying Action. The Commission claims the Judgment Debt arises from fraudulent conduct related to a mortgage-relief services scheme. (Doc. 30-1 at 5-7).[1] The Commission pursues a false-representation theory and an actual-fraud theory under § 523(a)(2)(A). (Doc. 30-1 at 20, 26). The Commission argues that § 523(a)(2)(A) requires the Court to except the Judgment Debt from discharge based on the fraudulent conduct for which Debtor was found liable in the Underlying Action, even if he did not personally engage in the direct fraudulent conduct himself. (Doc. 30-1 at 20-21).
In his response, Debtor asserts two essential theories of defense: 1) the independently-contracted sales staff engaged in the fraudulent activity, not Debtor himself, therefore Debtor is insulated and the debt is dischargeable; and 2) all fraudulent statements made by the sales staff were oral statements "respecting" Debtor's "financial condition" and, therefore, the debt is dischargeable, citing In re Appling, 848 F.3d 953 (11th Cir. 2017). Debtor contends the "[p]hone solicitation 'conversations' with consumers facing mortgage foreclosure focused upon [Debtor]'s law practice business model and the financial strategy of his foreclosure defense law practice." (Doc. 41 at 6). Debtor contends the "details of his professional strategy and the success rate that he enjoyed certainly 'impacted on' his financial condition reflecting 'his overall financial status.' " (Doc. 41 at 6); (Docs. 47 & 44). Debtor attached an affidavit to his reply in support of his cross-motion, which the Court fully considered in determining the present issues. (Doc. 50 at 7-19).
Undisputed Facts
The Commission sued Debtor (who is a Florida attorney)[2] and his law firms, Lanier Law and Liberty & Trust Law Group of Florida, among other codefendants, for violating the FTC Act, the Telemarketing Sales Rule, and the Mortgage Assistance Relief Services Rule (MARS Rule or Regulation O). The essential allegations were that the defendants misrepresented their ability to obtain mortgage modifications and reduce loan obligations, charged consumers disallowed advance fees for mortgage relief services, failed to communicate required disclosures to customers and potential customers, and initiated impermissible outbound telephone sales calls.
*906 The District Court entered a 78-page interlocutory order granting summary judgment (the "Interlocutory Order") (Doc. 1-3) and a final order of summary judgment (the "Final Order") (Doc. 1-2). The Final Order enjoined Debtor and his codefendants from engaging in various practices, entered a joint-and-several money judgment against Debtor and his codefendants, appointed an agent to liquidate Debtor's assets and turn over the proceeds to the Commission, and imposed standards for Debtor's (and his codefendants') compliance reporting. (Doc. 1-2).
The common enterprise.
Debtor's codefendants included his law firms, other attorneys, and other law firms. The District Court concluded that this group of law firms and attorneys operated as a "common enterprise." (Doc. 1-3 at 43). The common enterprise used independently contracted sales staff to market mortgage relief services to consumers, and used contracted of-counsel attorneys to expand operations throughout the nation. (Doc. 1-3 at 43); (Doc. 1-3 at 15). It appears the codefendants had hoped the independent nature of the sales staff and the of-counsel attorneys would insulate the members of the common enterprise against liability. As detailed below, the consumers were led to believe they would receive legal representation from the codefendants through local of-counsel attorneys, while the contracted of-counsel attorneys were told they were responsible only for document review and that they did not represent the consumers. Ultimately, none of the consumers received the legal representation that was promised.
The staffing agencies and salesforce personnel.
Specifically, the District Court concluded the law firms "used separate companies, such as DOLMF,[3 ] Pinnacle, and FURF[4 ](the 'staffing' agencies), to solicit consumers, answer calls from consumers, and convince consumers to retain a law firm's services." (Doc. 1-3 at 23) (footnotes added). In the Underlying Action, the Commission presented "declarations from over sixty consumers who largely recount similar experiences with Lanier Law, the DC Entities[5 ] and Liberty & Trust (the Law Firms)." (Doc. 1-3 at 27) (footnote added). "[T]hese declarations describe conversations with salespersons which were replete with misrepresentations about the Law Firms." (Doc. 1-3 at 27). "In these introductory conversations, either the initial contact person or the case manager would tell the consumer that the Law Firm could obtain a loan modification for the consumer with significantly lower payments and a lower interest rate." (Doc. 1-3 at 28). "Sometimes, the representative would specifically state the amount of the anticipated reduced mortgage payment, and/or that the interest rate would be lowered to 2 or 3%." (Doc. 1-3 at 28). "Many consumers were told that the Law Firm could get the consumer a reduction in principal, removal of fees, or amounts past due wiped away." (Doc. 1-3 at 28). "Some consumers recall that they were even 'promised'
*907 or 'guaranteed' a loan modification." (Doc. 1-3 at 29).
"Consumers were often reassured that the Law Firm[s] had success rates upwards of 80 and 90%." (Doc. 1-3 at 29). "Sometimes representatives convinced consumers that these modifications were possible by explaining that the firm would perform an 'audit' or examination of their loan documents to find errors made by the lender which would increase the consumer's bargaining power or even 'require' the lender to approve a modification." (Doc. 1-3 at 29). "In some cases, consumers were told that they had been 'approved' or that they 'qualified' for programs designed to keep them in their homes." (Doc. 1-3 at 29). "Many consumers believed, and some were explicitly told, that a lawyer would work on their case, and some consumers were specifically told that they needed the help of a lawyer to obtain a loan modification." (Doc. 1-3 at 30). "In reliance on the foregoing or similar representations, even skeptical consumers were eventually persuaded to hire one of the Law Firms to save their homes." (Doc. 1-3 at 30).
The of-counsel attorney network.
The District Court concluded the "principals of Lanier Law and the DC Entities associated 'of counsel' attorneys in other states so that these businesses could expand their operations to those states." (Doc. 1-3 at 15). "As such, the client agreements that Lanier Law and the DC Entities provided to consumers refer to the law firm retaining 'outside counsel' or working with 'counsel local to Client,' to provide the consumer with legal representation." (Doc. 1-3 at 15).
Seven of these of-counsel attorneys submitted declarations to be used as summary-judgment evidence in the Underlying Action. (Doc. 1-3 at 17-19). These attorneys generally did not contact client-consumers or confer with any banks, lenders, or mortgage servicers on the clients' behalf. (Doc. 1-3 at 18). "Some of these attorneys assert that Lanier specifically told them that the work only involved reviewing files 'to see that they were properly completed, signed and dated,' with 'no litigation, no court appearances, and no legal research.' " (Doc. 1-3 at 18). "Some of these attorneys do recall being asked to review pleadings that a consumer would file in court pro se. However, the review was largely editorial, correcting typographical errors, grammar, syntax and formatting." (Doc. 1-3 at 19). The District Court concluded the of-counsel attorneys did not provide actual legal representation to any of the client-consumers, with respect to foreclosure-defense or loan-modification matters. (Doc. 1-3 at 17-23).
Debtor's involvement in the deceptive practices.
The District Court concluded that Debtor held "sole ownership interest in the Lanier Law entities as well as Liberty & Trust." (Doc. 1-3 at 72). "Moreover, Lanier admitted in his Guilty Plea to the Florida Bar that he had supervisory responsibility over DOLMF and Pinnacle [i.e., staffing agencies] during the time period that those entities worked for him." (Doc. 1-3 at 73). "Although [Debtor] did not hold an express contractual interest in the DC Entities, the email records establish that [Debtor] still actively participated in the conduct of those companies and exercised control over their affairs." (Doc. 1-3 at 73 & 43). The undisputed evidence further "establishe[d] that [Debtor] was aware that consumers were being misled by virtue of the Florida Bar grievance proceedings, consumer complaints to the Better Business Bureau (BBB), as well as the inquiries he received from consumer protection departments in various states." (Doc. 1-3 at 73) (citations omitted). In light of this, the District Court found "ample evidence to conclude that [Debtor] had authority to control and actively participated *908 in the affairs of the common enterprise, and was entirely aware of the misrepresentations made to consumers." (Doc. 1-3 at 73).
The District Court's conclusions of fraud.
The Court concluded, "[t]o the extent consumers were led to believe that an attorney would assist them in obtaining a loan modification, such representations were false when made." (Doc. 1-3 at 41). "Many of the consumers report that once they began paying a Law Firm, they stopped hearing from them, their calls were not answered or returned, they were transferred to new case managers, and it became difficult to communicate with anyone at the [respective] Firm." (Doc. 1-3 at 37). "Notably, neither Lanier Law nor the DC Entities present[ed] evidence of any consumer who received a loan modification substantially reducing their monthly payment or who otherwise was satisfied with Defendants' services." (Doc. 1-3 at 39) (underlining in original).
"The Law Firms operated using a business model where 'of counsel' attorneys had no substantive role in the loan modification process because the Law Firms rarely, if ever, referred clients to those attorneys to perform that function. Indeed, the 'of counsel' attorneys report that it was [Debtor] who described to them their limited responsibilities, and [one such attorney] recounts that [Debtor] instructed him that [he] had no fiduciary relationship to the Law Firms' clients." (Doc. 1-3 at 41). "[Debtor] does not deny these statements. ... [T]he 'of counsel' attorneys were led to believe that their sole function was document review, and they would be contacted if additional work was necessary. Indeed, it appears the Law Firms actually impeded contact between the 'of counsel' attorneys and consumers." (Doc. 1-3 at 41). "The evidence before the Court is sufficient to establish that consumers were led to believe that they would have legal representation in the loan modification process and such statements were false or misleading, not because the 'of counsel' attorneys failed to fulfill their responsibilities, but because of the manner in which the Law Firms utilized their 'of counsel network.' " (Doc. 1-3 at 41-42).
The Interlocutory Order goes on, "Plainly, members of the common enterprise made numerous misrepresentations to consumers." (Doc. 1-3 at 51). "Perhaps the most egregious example of deceptive conduct by Lanier Law and the DC Entities is the use of the Economic Stimulus Flyer ...." (Doc. 1-3 at 51). "This solicitation is clearly misleading in that it is titled a 'Payment Reduction' or 'Mortgage Relief' Notification, references an 'Economic Stimulus,' and is designed to appear as an official notice from the government.' " (Doc. 1-3 at 51). "Although the Flyer disclaims any affiliation with the government, the consumer is left with the impression that a non-profit organization has determined that he is eligible for government assistance with his mortgage, and the consumer need only complete a registration process to receive this assistance." (Doc. 1-3 at 52). "As such, everything about this Flyer is deceptive and misleading." (Doc. 1-3 at 52). The 78-page Interlocutory Order discusses further examples of fraud and misrepresentation, which the Court has duly considered and taken into account. The Court omits these additional portions simply for brevity.
Standard for Summary Judgment
The chief question at summary judgment is whether there is sufficient conflicting evidence to warrant a trial. That is, summary judgment is appropriate if the pleadings and discovery show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) ;
*909 Fed. R. Bankr. P. 7056. The court must view the evidence in a light most favorable to the non-movant. In re Delco Oil, Inc., 599 F.3d 1255, 1257 (11th Cir. 2010). The movant bears the initial burden of demonstrating the absence of a triable issue. Id. Once the movant meets the initial burden, the burden shifts to the non-movant to come forward with evidence, beyond its pleadings, showing a genuine fact-question exists. Id.
Analysis
I. The plain language of § 523(a)(2)(A) does not require Debtor to personally and directly engage in the fraudulent conduct.
Unless there exists a patent or latent ambiguity, the plain language of Congress is the sole light guiding a court's application of a federal statute. "If the statutory language is plain, we must enforce it according to its terms." King v. Burwell, --- U.S. ----, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015). "We thus begin and end our inquiry with the text, giving each word its 'ordinary, contemporary, common meaning.' " Star Athletica, L.L.C. v. Varsity Brands, Inc., --- U.S. ----, 137 S.Ct. 1002, 1010, 197 L.Ed.2d 354 (2017). "While it is of course [the Court's] job to apply faithfully the law Congress has written, it is never [the Court's] job to rewrite a constitutionally valid statutory text under the banner of speculation ...." Henson v. Santander Consumer USA Inc., --- U.S. ----, 137 S.Ct. 1718, 1725, 198 L.Ed.2d 177 (2017) ; Puerto Rico v. Franklin California Tax-Free Trust, --- U.S. ----, 136 S.Ct. 1938, 1949, 195 L.Ed.2d 298 (2016).
Here, the question set forth by Congress is simply: whether the Judgment Debt is a "debt ... for money ... obtained by ... [ ] a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." 11 U.S.C. § 523(a)(2)(A). Nothing in this language requires the debtor to make the false representation or to personally and directly engage in the fraudulent conduct. Instead, the statute requires merely that the basis of the debt be "obtained by" the requisite fraudulent conduct without regard to whom was the direct actor. In other words, "[o]nce it is established that specific money or property has been obtained by fraud, [ ] 'any debt' arising therefrom is excepted from discharge." Cohen v. de la Cruz, 523 U.S. 213, 218-19, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) ; see also In re Bratcher, 289 B.R. 205, 214 (Bankr. M.D. Fla. 2003).
Debtor contends the case law addressing § 523(a)(2)(A) deals with debtors who were the direct actor and, therefore, the statute must require the debtor to directly engage in the fraudulent conduct. Debtor has presented no binding or persuasive case law stating such a requirement. While it is true that many nondischargeability suits involve a debtor who directly engaged in fraudulent conduct, requiring such direct involvement impermissibly imputes language into the statute that is not present. If Congress intends for § 523(a)(2)(A) to require a debtor to personally and directly engage in the subject fraudulent conduct, Congress has the authority to enact such a requirement. Unless and until that occurs, the statute as written contains no such requirement. See also In re Firestone, 26 B.R. 706, 714 (Bankr. S.D. Fla. 1982) (holding that evidence of numerous acts by debtor and his overall control of the business made debtor's personal liability for fraud proper grounds for determining whether the judgment debt was nondischargeable as a debt obtained by fraud, even though the underlying judgment did not find that debtor directly engaged with the defrauded plaintiff-creditors); In re Evans, 410 B.R. 317, 321 (Bankr. M.D. Fla. 2009) ("Courts, however, have held that acts which would merit nondischargeability *910 under Section 523(a) of the Bankruptcy Code can be attributed to a debtor who did not actually perform them, if the debtor was an 'active and knowing participant' in a scheme or conspiracy through which a third-party malefactor performed the acts.").
II. The District Court's judgment has preclusive effect in the instant proceeding.
Courts have "long recognized that 'the determination of a question directly involved in one action [may be] conclusive as to that question in a second suit.' " B & B Hardware, Inc. v. Hargis Indus., Inc., --- U.S. ----, 135 S.Ct. 1293, 1302, 191 L.Ed.2d 222 (2015). "A bankruptcy court may rely on collateral estoppel to reach conclusions about certain facts, foreclose relitigation of those facts, and then consider those facts as 'evidence of nondischargeability.' " In re Thomas, 288 Fed. Appx. 547, 548 (11th Cir. 2008). Federal common law governs the preclusive effect of a prior decision on a federal question. Taylor v. Sturgell, 553 U.S. 880, 891, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) ; Semtek Intern. Inc. v. Lockheed Martin Corp., 531 U.S. 497, 507, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) ("It is also true, however, that no federal textual provision addresses the claim-preclusive effect of a federal-court judgment in a federal-question case, yet we have long held that States cannot give those judgments merely whatever effect they would give their own judgments, but must accord them the effect that this Court prescribes.").[6]
In order for a party to be estopped from relitigating an issue regarding the dischargeability of a debt, the bankruptcy court must find the following four elements:
1. The issue in the prior action and the issue in the bankruptcy court are identical;
2. The bankruptcy issue was actually litigated in the prior action;
3. The determination of the issue in the prior action was a critical and necessary part of the judgment in that litigation; and
4. The burden of persuasion in the discharge proceeding must not be significantly heavier than the burden of persuasion in the initial action.
In re Bush, 62 F.3d 1319, 1322 (11th Cir. 1995) ; 18 Fed. Prac. & Proc. Juris. § 4416 (3d ed.) ; see also In re Dixon, 525 B.R. 827 (Bankr. N.D. Ga. 2015) (holding that district court's prior judgment in SEC's enforcement action has preclusive effect in nondischargeability proceeding); In re Porcelli, 325 B.R. 868 (Bankr. M.D. Fla. 2005) (holding that district court's final summary judgment in FTC enforcement action, which concluded that telemarketers employed by debtor's corporations made false and misleading statements to consumers, was entitled to preclusive effect in nondischargeability proceeding).
Here, under § 523(c), the Commission has "creditor standing" to bring a nondischargeability claim. In re Black, 95 B.R. 819, 821 (Bankr. M.D. Fla. 1989). In the following parts, the Court applies collateral-estoppel analysis to the Commission's two theories.
A. False representation.
"By creating the fraud exceptions to discharge, Congress sought to discourage *911 fraudulent conduct and ensure that relief intended for honest debtors does not inure to the benefit of dishonest ones." Birmingham Tr. Nat. Bank v. Case, 755 F.2d 1474, 1477 (11th Cir. 1985). Section 523(a)(2)(A) of the Bankruptcy Code"sets forth three separate grounds for non-dischargeability: false pretenses, a false representation, and actual fraud." In re Lloyd, 549 B.R. 282, 291 (Bankr. M.D. Fla. 2016). Courts have "historically construed the terms in § 523(a)(2)(A) to contain the elements that the common law has defined them to include." Husky Int'l Elecs., Inc. v. Ritz, --- U.S. ----, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016). "In the Eleventh Circuit, a debtor must gain a benefit from the money that was obtained by fraudulent means. That is, '[i]f the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable.' " In re Howard, 261 B.R. 513, 519 (Bankr. M.D. Fla. 2001).
Under a false-representation theory, the "creditor must prove that: (1) the debtor [or other pertinent actor] made a false representation to deceive the creditor, (2) the creditor [or other person/entity] relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor [or other person/entity] sustained a loss as a result of the misrepresentation." Lloyd, 549 B.R. at 291 (bracketed language added). "In the Eleventh Circuit, a debtor must gain a benefit from the money that was obtained by fraudulent means. That is, '[i]f the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable.' " In re Howard, 261 B.R. 513, 519 (Bankr. M.D. Fla. 2001).
Here, the District Court concluded Debtor participated in a common enterprise that materially misled consumers in order to entice the consumers to pay for legal services they would never receive-"not because the 'of counsel' attorneys failed to fulfill their responsibilities, but because of the manner in which the Law Firms utilized their 'of counsel network.' " (Doc. 1-3 at 42). The statements made by the sales personnel were materially false. (Doc. 1-3 at 27) ("[T]hese declarations describe conversations with salespersons which were replete with misrepresentations about the Law Firms."). The District Court concluded the consumers relied on these misrepresentations; such reliance is plainly justified under the instant facts and where Debtor and his codefendants were held liable for the misrepresentations.[7] (Doc. 1-3 at 30) ("In reliance on the foregoing or similar representations, even skeptical consumers were eventually persuaded to hire one of the Law Firms to save their homes."). Further, because the consumers never received the legal services they were promised, the consumers suffered economic loss as a result of the false representations. Finally, as a principal in the common enterprise, Debtor benefitted from the false representations made by the sales staff. (Doc. 1-3 at 73-74); Porcelli, 325 B.R. at 873.
The misrepresentation issues in the instant proceeding are identical to the misrepresentation issues in the Underlying Action, and these issues were "actually litigated" in the Underlying Action. The determination of these issues was clearly a "critical and necessary" part of the Underlying Action. Finally, the present burden of persuasion is not significantly heavier than in the Underlying Action.
*912 Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("A final consideration supporting our conclusion that the preponderance standard is the proper one is that, [ ] application of that standard will permit exception from discharge of all fraud claims creditors have successfully reduced to judgment."). Therefore, the Underlying Action has preclusive effect on the present proceeding and the Commission has conclusively shown the Judgment Debt should not be discharged, under its false-representation theory.
B. Actual fraud.
"Although 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely." Husky, 136 S.Ct. at 1586. "Actual fraud precluding discharge 'consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.' " In re Howard, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001) ; 4 Collier on Bankruptcy ¶ 523.08[1][e] (16th ed. 2017). When a misrepresentation is present under any of the three types of fraud listed in § 523(a)(2)(A), justifiable reliance must also be shown. In re Cahill, 2017 WL 713565, at *7 (Bankr. E.D.N.Y. Feb. 22, 2017).
Here, the core issue in the Underlying Action was whether Debtor and the common enterprise cheated consumers by misrepresenting the mortgage-relief services and legal representation the consumers would receive in exchange for periodic and upfront payments. The District Court concluded Debtor and the common enterprise engaged in a design or plan to trick/deceive consumers. (Doc. 1-3 at 77) ("The FTC has presented substantial uncontroverted evidence of [Debtor's] and [other d]efendants' continuous and persistent involvement in deceptive and misleading practices in connection with the sale of mortgage assistance relief services."). As stated above, Debtor and the common enterprise lured consumers into believing they would receive services which the common enterprise never intended to provide, given how the of-counsel network of attorneys was set up and operated. (Doc. 1-3 at 15-23); (Doc. 1-3 at 41-42) ("The evidence before the Court is sufficient to establish that consumers were led to believe that they would have legal representation in the loan modification process and such statements were false or misleading, not because the 'of counsel' attorneys failed to fulfill their responsibilities, but because of the manner in which the Law Firms utilized their 'of counsel network.' ").
The fraud issues in the instant proceeding are identical to the fraud issues in the Underlying Action, and these issues were "actually litigated" as a "critical and necessary" part of the Underlying Action. The Commission has carried its burden of demonstrating District Court's Final Order has preclusive effect on the instant proceeding and the Judgment Debt should be excepted from discharged pursuant to the actual-fraud exception found in § 523(a)(2)(A).
III. The Judgment Debt is not a debt for money obtained by an oral statement respecting the Debtor's financial condition.
"[A] debt incurred by an oral, fraudulent statement respecting the debtor's financial condition can be discharged in bankruptcy." In re Appling, 848 F.3d 953, 957 (11th Cir. 2017) ("If these statements do not respect his financial condition, [debtor] can discharge his debt to [creditor] in bankruptcy only if he disproves an element of fraud. But if the statements do respect his financial condition, [debtor] can discharge his debt to [creditor] because the statements were not *913 in writing."), cert. pending, No. 16-1215. The Bankruptcy Code, however, does not define the phrase "statement respecting the debtor's financial condition," found in § 523(a)(2)(A). Courts have toiled in earnest to apply this statutory phrase. Id. ("The circuits and other federal courts are split on this question.").
" 'Financial condition' likely means one's overall financial status." Id. at 958. Put differently, " 'financial condition' likely refers to the sum of all assets and liabilities." Id."But even if 'financial condition' means the sum of all assets and liabilities, it does not follow that the phrase 'statement respecting the debtor's ... financial condition,' covers only statements that encompass the entirety of a debtor's financial condition at once." Id. (citations omitted). " 'Respecting' is defined broadly as '[w]ith regard or relation to; regarding; concerning.' " Id.
Here, Debtor contends as follows: "Since all of the alleged telephone misrepresentations were necessarily oral, and since they all pertained to [Debtor]'s law practice and hence 'respected' his financial condition, then even if everything that the Commission has alleged about [Debtor] were true, the resultant judgment debt is nonetheless dischargeable." (Doc. 44 at 7-8) (Debtor's cross motion); (Doc. 41 at 5-6) (Debtor's response). However, there are two errors in this logic.
First, the oral misrepresentations made by the salespeople did not directly relate to any portion of Debtor's personal assets or liabilities. See (Doc. 1-3 at 27-30). The fraudulent sales pitches did not relate to his personal financial condition in any way whatsoever. Therefore, applying the Appling standard cited by Debtor, the oral misrepresentations did not "respect" or relate to Debtor's personal "financial condition."
Second, this argument completely ignores the written misrepresentations, such as the Economic Stimulus Flyer and other written mailings. (Doc. 1-3 at 51) ("Perhaps the most egregious example of deceptive conduct by Lanier Law and the DC Entities is the use of the Economic Stimulus Flyer described above."). These writings also do not relate to any portion of Debtor's personal assets or liabilities.[8] Therefore, even if Debtor was correct that the oral misrepresentations respected his personal financial condition, the written misrepresentations are sufficient to warrant an exception to discharge under § 523(a)(2)(A) since these writings do not respect Debtor's personal financial condition. Therefore, Debtor's theory of defense is without merit and he has not shown a genuine issue of material fact.
Conclusion
This Court is satisfied that the District Court's Interlocutory Order and Final Order satisfy the elements required to except the Judgment Debt from discharge under section 523(a)(2)(A) of the Bankruptcy Code. The Commission has carried its burden under both of its theories of nondischargeability, and Debtor has failed to present any evidence creating a genuine issue of material fact as to the applicability of collateral estoppel.
Debtor need not personally and directly engage in the subject fraudulent conduct, but must benefit from the fraudulent conduct. In re Howard, 261 B.R. 513, 519 (Bankr. M.D. Fla. 2001). The Commission need not have relied on or suffered direct harm from the fraudulent conduct because the Commission has "creditor standing," under § 523(c), to bring a nondischargeability action for a judgment debt arising from its enforcement action. In re Porcelli, 325 B.R. 868 (Bankr. M.D. Fla. 2005) ;
*914 In re Black, 95 B.R. 819, 821 (Bankr. M.D. Fla. 1989). The District Court's Interlocutory Order and Final Order establish the necessary fraudulent conduct and that Debtor benefited from that fraudulent conduct. The Judgment Debt should be excepted from discharge under a false-representation theory and an actual-fraud theory-either of which standing alone would be sufficient. Finally, as a matter of law, neither the oral nor written fraudulent statements respect Debtor's financial condition. Therefore, since collateral estoppel prevents Debtor from relitigating the case and there are no issues of material fact as to the nondischargeability, the Commission is entitled to summary judgment. Porcelli, 325 B.R. 868 ; Black, 95 B.R. at 821.
Accordingly, the Commission's motion for summary judgment is GRANTED and the Debtor's cross-motion for summary judgment is DENIED, as a matter of law. A final judgment in favor of the Commission and against Debtor, consistent with this opinion, will be entered separately.

In citing the Commission's brief, the Court refers to the PDF page number and not the page number printed at the bottom of each page, as these numbers differ.

In December 2011, the Florida Bar began investigating Debtor's law practice. In November 2012, the Florida Bar served a complaint on Debtor alleging violations of the Rules Regulating the Florida Bar with respect to Debtor's foreclosure defense services. (Doc. 1-3 at 11). The Florida Bar suspended Debtor for forty-five days and, following his suspension, Debtor resumed his foreclosure defense practice in October 2013.

Department of Loss Mitigation and Forensics is a private entity that provided non-attorney staffing to some of the law-firm defendants in the Underlying Action. (Doc. 1-3 at 23).

First United Relief Foundation is also a private entity that provided non-attorney staffing. (Doc. 1-3 at 23).

The District Court refers to three law firms formed in the District of Columbia as the "DC Entities." (Doc. 1-3 at 11). The DC Entities were three of the several law firms involved in the common enterprise.

But see CSX Transp., Inc. v. Gen. Mills, Inc., 846 F.3d 1333, 1340 (11th Cir. 2017) ("We hold that federal common law borrows the state rule of collateral estoppel to determine the preclusive effect of a federal judgment where the court exercised diversity jurisdiction.").

Field v. Mans, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ; In re Vann, 67 F.3d 277, 283 (11th Cir. 1995) ("To constitute justifiable reliance, '[t]he plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility.' ").

The Commission does not seek an exception to discharge under § 523(a)(2)(B).